

**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

05/05/2016

Preferred Family Healthcare, Inc.
Attn: Linda Sowersby
PO Box 1277
Springfield, MO 65801-1277

Re: **PHSD1140827**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Indemnity Insurance Company for your insurance needs. Our first class customer service, national presence and A++ (Superior) A. M. Best financial strength rating have made us the selection by over 550,000 policyholders nationwide. I realize you have a choice in insurance companies and truly appreciate your business.

I wish you much success this year and look forward to building a mutually beneficial business partnership which will prosper for years to come. Welcome to PHLY and please visit PHLY.com to learn more about our Company!

Sincerely,

Robert D. O'Leary Jr.
President & CEO
Philadelphia Insurance Companies

RDO/sm

EXHIBIT

1

- Receive Invoices Electronically
- Pay Your Bills Online
- Set Up Recurring Payments
- Available 24/7
- Safe and Secure
- NO FEE!
- Environmentally Friendly

# Enroll Today!

## Pay Your Bill Online

To pay your bills online you will need a User ID and Password to access our website. If you don't have a User ID please create one by visiting https://www.PHLY.com/myphly/newuser.aspx.

If you have a User ID, please login and click on *"Online Bill Pay"* and enter the necessary information to pay your bills.
Philadelphia Insurance Companies accepts electronic checks (a debit from your checking or savings account) as a method of payment. Please allow 2 to 3 business days for your payment to post to your account. This service is offered free of charge. Please note that credit card payments cannot be made online.

## Recurring Payment

Customers that receive their bill directly (and not from their agent) can sign up for recurring payment via automatic withdrawals from a checking, savings, or money market account for direct bill policies.

If you do not already have an account on **PHLY.com** you will need to create one by visiting https://www.PHLY.com/myphly/newuser.aspx. Once logged in please refer to *"Links for You"* and click the *"Recurring Payment Instructions"* to learn how to enroll.  You can also click the *"Online Bill Pay"* tab on the left hand side to enroll in Recurring Payment.





**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

Focus on the Things that Matter; We'll Handle the Risk!®





**PHILADELPHIA**
INSURANCE COMPANIES

A Member of the Tokio Marine Group

# Making Things Easier for You!

## PHLY CUSTOMER SERVICE

### Did you know...
- The Loss Assistance Hotline provides Management & Professional Liability policyholders with two FREE HOURS of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under a PHLY policy
- You can review billing and payment history online
  *For example: Payment verifications go to MyPHLY on PHLY.com*
- You can pull up and print your invoices and policy documents online
- You can update your profile online
  *For example: Billing address or contact information changes*
- We offer live help within seconds: No complicated phone systems
- 94.4% of our policyholders would refer us to prospective customers*
- We provide 48 hour turnaround time on small business quotes and policy issuance in less than 10 days
- We provide interest free installments for accounts that generate at least $2,000 in premium

### Frequently Asked Questions
#### *How can I get information about my insurance?*
There are 5 different ways to contact Customer Service
- Customer Service 877.438.7459
- Customer Service Fax 866.847.4046
- Customer Service E-mail: custserv@phly.com
- Customer Service online chat
- PHLY.com – "Contact Us"

#### *When can I contact Customer Service?*
Customer Service is available Monday - Friday from 8:30 a.m. - 8:00 p.m. EST

#### *What forms of payment does PHLY accept?*
PHLY accepts 3 forms of payment:
- Check sent to the lock box
- Check by phone payments through our IVR (877.438.7459 – Option 1), website, or contact center representatives
- Credit card payments through our live contact center representatives (Visa, MasterCard, and American Express)

### Claims
- Average policyholder first party automobile losses settled in 10 days or less
- Same or next business day acknowledgements of newly reported and opened claims
- Claims representation nationally with Commercial Liability Claims Examiner Niche expertise
- 24/7 claims service. Staff efficiencies with paperless and industry leading systems
- Staff of Subrogation and Recovery Examiners exclusively dedicated to recovery efforts for policyholder paid losses
- Experienced, consistent staff and department structure

### Risk Management Services
- National network of in-house risk management professionals providing direct support to policyholders
- Product specific web-based risk management solutions through PHLY.com
- Interactive Driver Training online courses and examination at no additional charge
- Regular e-flyer communications on relevant risk management issues
- Strategic partnerships with best-in-class vendors for discounted MVR checks, abuse training, GPS, and many more

### Automatically included on most accounts
PHLY Bell Endorsement - Includes $50,000 limits each for Business Travel Accident Benefit, Donation Assurance, Emergency Real Estate Consulting Fee, Identity Theft Expense, Image Restoration and Counseling, Key Individual Replacement Expenses, Kidnap Expense, Terrorism Travel Reimbursement, Workplace Violence Counseling. $25,000 limits for each Conference Cancellation, Fundraising Event Blackout, Political Unrest ($5,000 per employee), Temporary Meeting Space Reimbursement, and $1,500 Travel Delay Reimbursement.

### Honors, Awards, and Ratings
- America's Top 150 Workplaces
- Best Places to Work in Insurance (4th consecutive year)
- Stevie Awards
- ACE Awards
- Top Workplaces in Philadelphia
- Ward's Top 50 (13th consecutive year)
- National Underwriter Top 100 Insurance Groups (Tokio Marine) #29
- National Underwriter Top 100 Insurance Companies #41

## *A Passion for Service!*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to Underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. © 2014 Philadelphia Consolidated Holding Corp., All Rights Reserved.
*All statistics contained herein were generated via an internal company survey of active policy holders.









# Risk Management Services

## PHLY RISK MANAGEMENT SERVICES

Welcome to PHLY Risk Management Services Services, PHLY is familiar with the unique Risk Management Services programming needs of you organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

OUR MISSION: We welcome the opportunity to demonstrate how we can tailor a risk management program suitable to our customer's needs. We are committed to providing our customers with improved communications, quicker implementation of loss control servicing initiatives, and specific benchmarking goals that help us quantify the true value of our services.

OUR MOTTO: "Innovative Services Producing Optimum Results:" This mantra reflects our commitment to utilize innovative products and solutions to help our customers achieve measurable results. Customer satisfaction through the delivery of these quality professional products is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

In order to gain full access to these resources and others, please take a moment to register on our website. If you already have an Id to PHLY.com, please login to access Risk Management Services resources.

### Risk Management Resources
- IntelliCorp Records, Inc.
- Accountants Resources
- WEMED Loss Assistance Hotline
- In2vote: Web-enabled EPLI (employment practices liability insurance) Risk Management Services

### Proprietary Risk Management Services
- PHLY Risk Management Services E-flyers
- Responding to Risk Management Services Recommendations

### Contact
- For more information please contact: Customer Service

# 800.873.4552

IMPORTANT NOTICE - The information and suggestions presented by Philadelphia Indemnity Insurance Company in this e-brochure is for your consideration in your loss prevention efforts. They are not intended to be complete or definitive in identifying all hazards associated with your business, preventing workplace accidents, or complying with any safety related, or other, laws or regulations. You are encouraged to alter them to fit the specific hazards of your business and to have your legal counsel review all of your plans and company policies.

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and you policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulators. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Consolidated Holding Corp., All Rights Reserved.







**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Philadelphia Indemnity Insurance Company

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
- ONE OR MORE COVERAGE FORMS
- APPLICABLE FORMS AND ENDORSEMENTS

BJP-190-1 (12-98)

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

President & CEO                                          Secretary

BJP-190-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201 or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.

Wilson Elser Moskowitz Edelman & Dicker LLP

## 800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.



# PHLY.com



PP 20 15 (06/15)

# PHILADELPHIA INSURANCE COMPANIES PRIVACY POLICY NOTICE

### Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies value your privacy and we are committed to protecting personal information that we collect during the course of our business relationship with you. The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information that we collect and how it may be used or disclosed. This does not reflect a change in the way we do business or handle your information.

Information We Collect:

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

Information We Disclose:

We will only disclose the information described above to our affiliates and non-affiliated third parties, as permitted by law, and when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker (producer);
- Parties who perform a business, professional or insurance functions for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, attorneys, other insurers or medical care providers who need information to investigate, defend or settle a claim involving you;
- Regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having a legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes. We do not disclose the personal information of persons who have ceased to be our customers.

Protection of Information:

The Philadelphia Insurance Companies maintain physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

Use of Cookies and Opt-Out:

We may place electronic "cookies" in the browser files of your computer when you access our website. Cookies are text files placed on your computer to enable our systems to recognize your browser and so that we may tailor information on our website to your interests. We or our third party service providers or business partners may place cookies on your computer's hard drive to enable us to match personal information that we maintain about you so that we are able to pre-populate on-line forms with your information. We also use cookies to help us analyze traffic on our website to better understand your interests. Although we do not use your non-public personal information for this purpose, you may opt-out of cookies and advertising features through one of the available options including but not limited to Ads Settings in Google.com or the Network Advertising Initiative (NAI) Consumer Opt-out. Opting out does not mean you will no longer receive online advertising. It does mean that companies from which you opted out will no longer customize ads based on your interests and web usage patterns using cookies.

How to Contact Us:  Philadelphia Insurance Companies, One Bala Plaza, Suite 100, Bala Cynwyd, PA  19004 Attention:  Chief Privacy Officer



**PHILADELPHIA INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Philadelphia Indemnity Insurance Company
## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1140827

**Named Insured and Mailing Address:**
Preferred Family Healthcare, Inc.
Attn: Linda Sowersby
PO Box 1277
Springfield, MO 65801-1277

**Producer:** 14457
Connell Insurance Inc.
PO Box 1840
Branson, MO 65615

(417)334-2000
at 12:01 A.M. Standard Time at your mailing
address shown above.

**Policy Period From:** 05/01/2016  **To:** 05/01/2017

**Business Description:** Non-Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage  Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers  Compensation | |
| Flexi Plus Five | 72,573.00 |
| **Total** | **$   72,573.00** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD1140827

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| Recurring Payment Flyer | 1212 | Recurring Payment Flyer |
| CSNotice-1 | 1014 | Making Things Easier |
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| PP2015 | 0615 | Privacy Policy Notice |
| CPD-PIIC | 0614 | Common Policy Declarations |
| Named Insured Sched | 0100 | Named Insured Schedule |
| IL0990 | 0115 | Missouri-Disclosure Pursuant to Terrorism Risk Ins Act |

Philadelphia Indemnity Insurance Company

Named Insured Schedule

**Policy Number:** PHSD1140827

dba Bridgeway Behavioral Health, Inc.
dba Bridgeway Counseling Services, Inc.

PI-NPD-1 (01-02)

 **PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**FLEXIPLUS FIVE**
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

### Philadelphia Indemnity Insurance Company

Policy Number: PHSD1140827

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item    1.    Parent Organization and Address:
Preferred Family Healthcare, Inc.
Attn: Linda Sowersby
PO Box 1277
Springfield, MO 65801-1277

Internet Address: www. n/a

Item    2.    Policy Period:    From: 05/01/2016 To: 05/01/2017
(12:01 A.M. local time at the address shown in Item 1.)

Item    3.    Limits of Liability:

|     |                               |    |            |                    |
|-----|-------------------------------|----|------------|--------------------|
| (A) | Part 1, D&O Liability:        | $  | 5,000,000  | each Policy Period. |
| (B) | Part 2, Employment Practices: | $  | 5,000,000  | each Policy Period. |
| (C) | Part 3, Fiduciary Liability:  | $  | 1,000,000  | each Policy Period. |
| (D) | Part 4, Workplace Violence:   | $  |            | each Policy Period. |
| (E) | Part 5, Internet Liability:   | $  |            | each Policy Period. |
| (F) | Aggregate, All Parts:         | $  | 10,000,000 | each Policy Period. |

PI-NPD-1 (01-02)

| Item | 4. | Retention: | | | |
|---|---|---|---|---|---|
| | | (A) | Part 1, D&O Liability: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| | | (B) | Part 2, Employment Practices: | $ | 75,000 for each Claim. |
| | | (C) | Part 3, Fiduciary Liability: | $ | 0 for each Claim. |
| | | (D) | Part 4, Workplace Violence: | $ | for each Workplace Violence Act. |
| | | (E) | Part 5, Internet Liability: | $ | for each Claim. |

Item 5.     Prior and Pending Date:  Part 1     05/01/2015     Part 2     05/01/2015     Part 3     05/01/2015
                                              Part 4 No Date Applies   Part 5 No Date Applies

Item 6.     Premium:                     Part 1   $ 46,264.00   Part 2   $ 25,067.00   Part 3  $   1,242.00
                                              Part 4                  Part 5

              State Surcharge/Tax:                                 Total Premium: $ 72,573.00

Item 7.     Endorsements:   PER SCHEDULE ATTACHED

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.


Authorized Representative          Countersignature                Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Flexi Plus Five

**Policy Number:** PHSD1140827

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-NPD-1 | 0102 | FlexiPlus Five Declarations Page |
| PI-BELL-1 MO | 1109 | Bell Endorsement |
| PI-CME-1 MO | 1109 | Crisis Management Enhancement Endorsement |
| PI-NPD-2 | 0102 | Flexi Plus Five Coverage Form |
| PI-NPD-4 | 0102 | Additional Organization Endorsement |
| PI-NPD-8 | 0102 | Shared Limits Endorsement |
| PI-NPD-25 | 0102 | Professional Services Exclusion(Supervision Carve-Out) |
| PI-NPD-26 | 0102 | Related Party Exclusion |
| PI-NPD-27 | 1011 | Sexual Abuse Exclusion |
| PI-NPD-41 | 1011 | Anti-Trust And Unfair Trade Practice Sublimit Endt |
| PI-NPD-50 | 0803 | Health Ins Portability and Accountability Act (HIPAA) |
| PI-NPD-52 | 1203 | Amendment of Exclusions |
| PI-NPD-68 | 0905 | Waiver of Recourse Endorsement |
| PI-NPD-82 MO | 1012 | Pro-Pak Elite Enhancement Missouri |
| PI-Notice-MO | 0401 | Important Notice |
| PI-NPD-MO-1 | 0102 | Amendatory Endorsement Missouri |
| PI-SLD-001 | 0108 | Cap On Losses From Certified Acts Of Terrorism |

POLICY NUMBER: PHSD1140827

IL 09 90 01 15

# MISSOURI – DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**   $ 0 |
| This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies): |
| |
| |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| |
| |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses**    85   % Year: 2015 |
| (Refer to Paragraph **B.** in this endorsement.) |
| |
| **Federal share of terrorism losses**    84   % Year: 2016 |
| (Refer to Paragraph **B.** in this endorsement.) |
| |
| **Federal share of terrorism losses**    83   % Year: 2017 |
| (Refer to Paragraph **B.** in this endorsement) |
| |
| **Federal share of terrorism losses**    82   % Year: 2018 |
| (Refer to Paragraph **B.** in this endorsement) |
| |
| **Federal share of terrorism losses**    81   % Year: 2019 |
| (Refer to Paragraph **B.** in this endorsement) |
| |
| **Federal share of terrorism losses**    80   % Year: 2020 |
| (Refer to Paragraph **B.** in this endorsement) |

**NOTE: The premium above is for certain losses resulting from certified acts of terrorism as covered pursuant to coverage provisions, limitations and exclusions in this policy. You should read the definition in your policy carefully, but generally speaking, "certified" acts of terrorism are acts that exceed $5 million in aggregate losses to the insurance industry and which are subsequently declared by the U.S. Secretary of the Treasury as a certified terrorist act under the Terrorism Risk Insurance Act. Some losses resulting from certified acts of terrorism are not covered. Read your policy and endorsements carefully.**

          © Insurance Services Office, Inc., 2015

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015        **IL 09 90 01 15**

PI-BELL-1 MO (11/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BELL ENDORSEMENT



PHILADELPHIA
INSURANCE COMPANIES

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

PI-BELL-1 MO (11/09)

**II.   CONDITIONS**

**A.   Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

**B.   Limits of Liability or Limits of Insurance**

1.   When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

2.   Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

**C.   Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.   Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

1.   The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

2.   The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**B.   Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

PI-BELL-1 MO (11/09)

1. The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

2. For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

3. In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

   a. Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

   b. The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

4. No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

5. A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period. The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D.  Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled. The fundraising event must have been planned at least thirty (30) days prior to the power outage. The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**E.  Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us. The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**F.  Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

PI-BELL-1 MO (11/09)

Covered expenses are limited to:

1. The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2. The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3. The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**G. Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer. Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

   a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

   b. Discovery of their death;

   c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

   d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined. No deductible applies to this coverage.

**H. Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest." This "political unrest" must occur

during the policy period. No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel. The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

### I.   Temporary Meeting Space Reimbursement

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

### J.   Terrorism Travel Reimbursement

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses." The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

### K.   Travel Delay Reimbursement

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier. The limit of insurance for this coverage is $1,500 per policy period for all insureds combined. A seventy-two (72) hour waiting period deductible applies to this coverage.

### L.   Workplace Violence Counseling

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period. The emotional counseling expenses incurred must have been for:

1.   Your employees who were victims of, or witnesses to the "workplace violence";

2.   The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

3.   Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

## IV.   DEFINITIONS

For the purpose of this endorsement, the following definitions apply:

A.   "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

B.   "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

© 2009 Philadelphia Insurance Companies

**C.** "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.** "Emergency evacuation expenses" mean:

    **1.** Additional lodging expenses;

    **2.** Additional transportation costs;

    **3.** The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

    **4.** Translation services, message transmittals and other communication expenses.

    provided that these expenses are not otherwise reimbursable.

**E.** "Emergency travel expenses" mean:

    **1.** Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

    **2.** The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

    provided that these expenses are not otherwise reimbursable.

**F.** "Failed donation claim" means written notice to the insured during the policy period of:

    **1.** The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

    **2.** The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

**G.** "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

**H.** "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**I.** "Identity theft expenses" mean:

    **1.** Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

    **2.** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

    **3.** Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

**J.** "Improper acts" means any actual or alleged act of:

    **1.** Sexual abuse;

    **2.** Sexual intimacy;

    **3.** Sexual molestation; or

    **4.** Sexual assault;

committed by an insured against any natural person who is not an insured. Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

**K.** "Injury" means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**M.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**N.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**O.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**P.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

PI-BELL-1 MO (11/09)

**Q.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

PI-CME-1 MO (11/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.   SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                              $25,000

**II.   CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.**   We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**   We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.  However, expenses reported to us after six (6) months of the date the "crisis" was

initiated will not be denied solely because of the late submission, unless such late submission operates to prejudice our rights.

**IV.   DEFINITIONS**

    **A.** "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

    **B.** "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm." However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

    **C.** "Crisis management firm" means any service provider you hire that is acceptable to us.  Our consent will not be unreasonably withheld.

    **D.** "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

    **E.** "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

# Philadelphia Insurance Companies

# FLEXI PLUS
# FIVE



---

Not-for-Profit Organization Directors
& Officers Liability Insurance

---

Employment Practices
Liability Insurance

---

Fiduciary Liability Insurance

---

Workplace Violence Insurance

---

Internet Liability Insurance

---

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900   Fax: 610.617.7940

PI-NPD-2 (01/02)

## FLEXI PLUS FIVE
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY
INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

**EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS-MADE POLICY.**

**CLAIMS-MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## Part 1

### Not-for-Profit Organization Directors & Officers Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

   A.   The **Underwriter** will pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.

   B.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Organization** has indemnified such **Individual Insureds** for such **Loss**.

   C.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.   DEFINITIONS

   A.   **D&O Wrongful Act** means any actual or alleged:

   1.   Act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or by the **Organization**; or

   2.   Act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** while

PI-NPD-2 (01/02)

serving as a director, officer, governor or trustee of any **Outside Entity**, if such service is at the written request or direction of the **Organization**.

However, **D&O Wrongful Act** does not include an **Employment Practice Act, Fiduciary Liability Act**, or **Internet Liability Act**.

B.  **Outside Entity** means:

1.  Any not-for-profit entity described in Section 501(c) of the Internal Revenue Code of 1986 (as amended); or

2.  Any other entity listed as an **Outside Entity** in an endorsement to this Policy.

C.  **Personal & Advertising Injury** means any actual or alleged:

1.  False arrest, detention or imprisonment, or malicious prosecution; or

2.  Oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services; or

3.  Oral or written publication of material that violates a person's right of privacy; or

4.  Wrongful eviction or entry or other invasion of the right of privacy; or

5.  Misappropriation of advertising ideas, unauthorized use of title or slogan, or plagiarism; or

6.  Infringement of copyright or trademark.

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

A.  Arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

B.  Arising out of, based upon or attributable to any actual or alleged:

1.  Publication or utterance of material by or at the direction of such **Insured** with knowledge of its falsity; or

2.  Composing, editing, designing, publishing, distributing or printing periodicals, advertisements or other materials by the **Insured** for another party if such activity is not in connection with and not a regular part of the **Insured's** own publications; or

3.  Failure of goods, products or services to conform with advertised quality or performance; or

4.  Wrong description of the price of goods, products or services;

C.  Arising out of, based upon or attributable to any actual or alleged breach of contract or agreement. However, this exclusion shall not apply to the following:

1.  Liability of the **Insured** which would have attached even in the absence of such contract or agreement; or

PI-NPD-2 (01/02)

   2.  **Defense Costs**.

IV.  PRESUMPTIVE INDEMNIFICATION

If the **Organization** is permitted or required by common or statutory law, but fails to indemnify the **Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## Part 2

### Employment Practices Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.  INSURING AGREEMENTS

   A.  The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act**.

II.  DEFINITIONS

   A.  **Employment Practice Act** means any actual or alleged:

      1.  Wrongful dismissal, discharge or termination of employment;

      2.  Breach of a written or oral employment contract or implied employment contract;

      3.  Employment related misrepresentation;

      4.  Wrongful failure to promote;

      5.  Violation of employment discrimination laws (including harassment);

      6.  Wrongful deprivation of a career opportunity;

      7.  Employment related wrongful discipline;

      8.  Negligent employee evaluation;

      9.  Employment related invasion of privacy;

      10.  Employment related defamation (including libel and slander);

      11.  Sexual or workplace harassment of any kind;

      12.  Constructive discharge of employment;

      13.  Employment related retaliation;

      14.  Employment related humiliation;

15. Wrongful demotion;

16. Negligent reassignment;

17. Violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Act** means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B.   **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Organization**.

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   Arising out of, based upon or attributable to any failure to comply with any law concerning Workers Compensation, Unemployment Insurance, Social Security, Disability Benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above laws;

B.   Arising out of, based upon or attributable to any violation of any of the responsibilities, obligations, or duties imposed by the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above statute, law, rule, regulation or order;

C.   Arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements;

D.   Arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1.   Liability of the **Organization** which would have attached even in the absence of such contract or agreement; or

PI-NPD-2 (01/02)

2. **Defense Costs**.

E. To the extent such **Loss** constitutes employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay.

## Part 3

### Fiduciary Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.  DEFINITIONS

A. **Administration** means: (i) giving counsel to employees, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of employees or participants under any **Benefit Plan**.

B. **Benefit Plan** means:

1. Any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the employees of the **Organization**;

2. Any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the employees of the **Organization**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. Any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the employees of the **Organization**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4. Any government-mandated benefit program for Workers Compensation, Unemployment, Social Security or Disability Benefit for employees of the **Organization**.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

However, **Benefit Plan** does not include any multi-employer plan.

PI-NPD-2 (01/02)

C.   **Fiduciary Liability Act** means any actual or alleged:

1.   Breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2.   Negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

However, **Fiduciary Liability Act** does not include a **D&O Wrongful Act** or an **Internet Liability Act**.

D.   **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E.   **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   Arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B.   To the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C.   Arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D.   Arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

### Part 4

#### Workplace Violence Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A.   The **Underwriter** will pay on behalf of the **Organization** any **Violence Damage**, resulting from a **Workplace Violence Act** occurring during the **Policy Period** and reported to the **Underwriter** pursuant to the terms of this Policy.

II.   DEFINITIONS

A.   **Violence Damage** means:

1.   **Business Interruption Expense**

2.   **Public Image Restoration Expense**

PI-NPD-2 (01/02)

3. **Workplace Violence Expense**

B. **Business Interruption Expense** means the amount calculated as set forth below for a period of time commencing on the day the **Workplace Violence Act** occurs until the earlier of ninety (90) days following such date, or until the **Organization** restores operations with due diligence and dispatch to the level that existed prior to the **Workplace Violence Act**:

   1. The sum of:

      a. Net profits before income taxes that would have been earned had no **Workplace Violence Act** occurred; and

      b. The actual cost of continuing the activities which are necessary for the **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Act**; and

      c. Reasonable expenses which would not have been incurred except for such **Workplace Violence Act** and which were incurred by the **Organization** for the sole purpose of reducing **Business Interruption Expense** described in B.1. (a. or b.) above, not to exceed the amount of actual reduction of such **Business Interruption Expense**; and

   2. Less the sum of:

      a. All recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expense** described in B.1. above; and

      b. The amount by which the **Organization** reasonably could have but fails to reduce **Business Interruption Expense** described in B.1. above.

C. **Public Image Restoration Expense** means reasonable fees and expenses for, or cost of:

   1. An independent public relations consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

   2. An independent security consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

   3. A counseling seminar for **Individual Insureds** conducted by an independent consultant following the **Workplace Violence Act**;

   4. Independent security guard service for up to thirty (30) days following the date the **Workplace Violence Act** occurs;

   5. An independent forensic analyst for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

D. **Workplace Violence Expense** means the reasonable fees and expenses for, or cost of:

   1. The **Salary** or **Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays **Individual Insureds** victimized by **Workplace Violence Acts** and unable to continue to work because of such **Workplace Violence Acts**. The **Salary** or **Wages** in effect at the time of the **Workplace Violence Act** shall apply;

PI-NPD-2 (01/02)

2.   The **Salary** or **Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays a newly hired person(s) to conduct the duties of **Individual Insureds** victimized by **Workplace Violence Acts** and who is/are unable to continue to work because of such **Workplace Violence Acts**; however such **Salary** or **Wages** shall not exceed the **Salary** or **Wages** of the victimized **Individual Insured** in effect at the time of the **Workplace Violence Act**.

E.   **Workplace Violence Act** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Premises**.

F.   **Premises** means any building, facility or property occupied by the **Organization** in conducting its operations.

G.   **Salary** or **Wages** means compensation the **Organization** pays an **Individual Insured**, including but not limited to bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 4 to make any payment for **Violence Damage**:

A.   Arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

B.   Arising out of, based upon or attributable to a **Workplace Violence Act** which occurs at any location other than the **Premises**;

C.   Arising out of, based upon or attributable to the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property;

D.   Arising out of, based upon or attributable to a **Workplace Violence Act** occurring prior to the Prior and Pending Date shown in Item 5. of the Declarations.

## Part 5

### Internet Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Internet Liability Act**.

II.   DEFINITIONS

A.   **Internet Activity** means any display, transmission, dissemination, or other use of **Matter** on an **Internet Site**.

B.   **Internet Site** means the Internet address(es) shown in Item 1. of the Declarations.

C.   **Matter** means printed, verbal, numerical, audio or visual expression, or any other expression, regardless of the medium upon which such expression is fixed.

PI-NPD-2 (01/02)

D. **Product** means any tangible property offered for sale or otherwise disseminated by or through any **Insured**.

E. **Internet Liability Act** means any actual or alleged act, error, or omission committed or attempted by an **Insured** in their capacity as an **Insured** solely in connection with **Internet Activity** by or on behalf of the **Organization**, including:

   1. Libel, slander, or oral or written publication of defamatory or disparaging material; or

   2. Invasion of or interference with the right of privacy; or

   3. Infringement of copyright, service mark, trademark, trade dress or trade name or title or slogan or improper use of literary or artistic titles, formats or performances.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 5 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. Arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto; or any rules and regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

B. Arising out of, based upon or attributable to any actual or alleged breach of contract or agreement, or for liability assumed by the **Organization** under a contract or agreement; however, this exclusion shall not apply to any of the following:

   1. Liability of the **Organization** which would have attached even in the absence of such contract or agreement;

   2. **Defense Costs**;

C. Arising out of, based upon or attributable to any actual or alleged:

   1. Wrong description of the price or authenticity of a **Product**; or

   2. Failure of any **Product** to conform with advertised quality or performance; or

   3. Sale or offer for sale of any **Product** that infringes upon the name, design or logo of another entity's **Product**;

D. Arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

E. To the extent such **Loss** constitutes amounts charged to or due from clients or customers of the **Organization**, or the value of any electronic fund transfer or transaction by or on behalf of the **Organization** which is lost or damaged during transfer into, from or between **Organization** accounts;

F. Brought or maintained by or on behalf of any federal, state, or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulations;

G.   Arising out of, based upon or attributable to the development, distribution, dissemination, installation, implementation, operation, maintenance and/or filtering software, or of policies, equipment or procedures for establishing or managing a secure method for exchanging electronic information;

H.   Arising out of, based upon or attributable to any costs, expenses or other payment incurred by the **Insured** or others in connection with the withdrawal or recall from the marketplace of the **Insured's Products**, including other products which incorporated the **Insured's Products**;

I.   Arising out of, based upon or attributable to coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

J.   Arising out of, based upon or attributable to (i) a computer virus, (ii) the unauthorized access to or use of a computer, computer system or computer network, or (iii) the inability of an authorized **Third Party** to access services provided by the **Organization** through the **Internet Site**.

## Part 6

## Common Policy Definitions

A.   **Application** means:

1.   The **Application** for this Policy, including any material submitted therewith; and

2.   The **Application(s)**, including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B.   **Claim** means for the purpose of Parts 1, 2, 3, and 5:

1.   Any written demand for monetary or non-monetary relief; or

2.   Any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or

3.   Any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

C.   **Damages** means a monetary judgment, award or settlement including punitive, exemplary or multiple portion thereof, or, with respect to Part 4 (Workplace Violence Insurance), **Violence Damage**.

D.   **Defense Costs** means:

1.   Any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

    a.   Any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.   Salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.   Salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**.

  2.   A $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

F.  **Individual Insured** means:

  1.   Any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization** or, solely with respect to Part 3 (Fiduciary Liability Insurance), of any **Benefit Plan**;

  2.   The lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such executive for which such spouse may be liable as the spouse of such executive;

  3.   The estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in 1. above which, in the absence of such death or incompetence, would have been covered by this Policy;

  4.   With respect to an **Organization** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Organization** that is equivalent to any position described in 1. above.

G.  **Insured** means the **Organization** and **Individual Insured**.

H.  **Interrelated Wrongful Act** means any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

I.  **Loss** means:

  1.   **Damages**;

  2.   **Defense Costs**;

but **Loss** does not include:

  1.   Criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

  2.   Taxes; or

PI-NPD-2 (01/02)

3.   Matters deemed uninsurable under the law to which this Policy shall be construed; or

4.   Any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

5.   Any costs other than **Defense Costs** associated with any accommodation required pursuant to the Americans With Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

J.   **Organization** means:

1.   The **Parent Organization**,

2.   Any **Subsidiary**, and

3.   Solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

K.   **Parent Organization** means the first entity named in Item 1. of the Declarations.

L.   **Policy Period** means the period of time specified in Item 2. of the Declarations.

M.   **Subsidiary** means:

1.   Any not-for-profit entity for which, on or before the inception of the **Policy Period,** the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as a **Subsidiary** in the **Application**;

2.   Any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total less than 35% of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**. The **Parent Organization** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3.   Any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total 35% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**; but only upon the condition that before the end of the **Policy Period** or within 90 days from having the right to elect or select a majority of the directors or trustees, whichever is lesser, the **Parent Organization** shall have provided the **Underwriter** with full particulars and agreed to any additional premium and/or amendment of the provisions of this Policy;

4.   Any for profit entity or the directors, officers, or trustees of a for profit entity for which, the **Underwriter**, at its sole discretion, agrees by written endorsement to provide coverage upon such terms or additional premium charged.

Further, coverage as shall be afforded by paragraphs 3. and 4. above, is conditioned upon the **Parent Organization** paying when due any applicable additional premium required by the **Underwriter** relating to such new **Subsidiary**.

N.   **Underwriter** means the stock insurance company check marked on the Declarations of this Policy.

PI-NPD-2 (01/02)

O.  **Wrongful Act** means:

1.   With respect to Part 1, any **D&O Wrongful Act,**

2.   With respect to Part 2, any **Employment Practices Act,**

3.   With respect to Part 3, any **Fiduciary Liability Act,**

4.   With respect to Part 5, any **Internet Liability Act.**

## Part 7

### Common Policy Exclusions

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

A.   Arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.   Arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured;** however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission. This exclusion shall not apply to a **Workplace Violence Act** under Part 4 (Workplace Violence Insurance);

No **Wrongful Act** of any **Insured** shall be imputed to any **Individual Insured** for the purpose of determining the applicability of Exclusions A. and B. above.

C.   Arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.   Arising out of, based upon or attributable to any bodily injury or property damage regarding tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.   Arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto, and any similar provisions of any federal, state or local statutory or common law;

F.   Arising out of, based upon or attributable to:

1.   Any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5. of the Declarations, or the same or essentially the same facts as alleged in such prior litigation; or

PI-NPD-2 (01/02)

2.  Any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.  Any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5. of the Declarations, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.  Arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.  To the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.  For any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; however, this exclusion shall not apply to Part 4 (Workplace Violence Insurance) or to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.  Brought or maintained by, at the behest, or on behalf of the **Organization**;

K.  For any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**; however, this exclusion shall not apply to Part 3 (Fiduciary Liability Insurance);

L.  For a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.  For service by the **Individual Insured** in any position or capacity in any entity other than the **Organization**, a **Benefit Plan** or an **Outside Entity**, even if the **Organization** directed or requested the **Individual Insured** to serve in such other position or capacity.

## Part 8

## Common Policy Conditions

I.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made or **Workplace Violence Acts** committed, the **Underwriter's** liability under the Policy is limited as follows:

A.  With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.  With respect to coverage under Part 2, Part 3, Part 4, or Part 5 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made, and all **Workplace Violence Acts** taking place, during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B), 3.(C), 3.(D) or 3.(E), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made, and all **Workplace Violence Acts** taking place, during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(F) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), 3.(C), 3.(D) and 3.(E) are sub-limits which do not increase the **Underwriter's** maximum liability as set forth in Item 3.(F).

D.   **Defense Costs** is in addition to and is not part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall not serve to reduce the Limit of Liability stated in Item 3. of the Declarations, but the **Underwriter** is not obligated to pay any **Defense Costs** after the applicable Limit of Liability has been exhausted by payment of **Damages**.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.   RETENTION CLAUSE

A.   The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4. of the Declarations. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts**.

III.   DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B.   If the **Insured** has assumed the defense of a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Costs** incurred, settlements made or judgments admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

C.   The **Underwriter** may investigate and, with the consent of the **Insured**, settle any **Claim** or **Workplace Violence Act** as the **Underwriter** deems expedient, but the **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.   In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall take reasonable measures to protect their interests.

E.   If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F.   The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agrees that in the event of a **Claim** or a

PI-NPD-2 (01/02)

**Workplace Violence Act**, the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.   If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations, even if consent is given to a subsequent settlement.

IV.   NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.   In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice of such **Claim** or **Workplace Violence Act** as soon as practicable to the **Underwriter** during this **Policy Period**, or, if applicable, during any Extension Period, but, not later than 60 days after the expiration date of this Policy or any Extension Period, if applicable.

B.   If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.  All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts**, or the same or related **Workplace Violence Acts**, shall be deemed one **Loss** on account of one **Claim** or one **Workplace Violence Act**. Such **Claim** or **Workplace Violence Act** shall be deemed to be first made or to have first occurred when the earliest of such **Claims** or **Workplace Violence Acts** were first made or first occurred.

V.  CANCELLATION AND NON-RENEWAL

A.  The **Underwriter** may not cancel this Policy except for failure to pay premium when due, in which case 10 days written notice shall be given to the **Parent Organization** for such cancellation to be effective.

B.  The **Parent Organization** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Parent Organization** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.  The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be sent to the **Parent Organization** at least 30 days prior to expiration of the **Policy Period**.

VI.  REPRESENTATIONS AND SEVERABILITY

A.  The **Insured** represents that the particulars and statements contained in the **Application** are true and agrees that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.  Except for material facts or circumstances known to the **Individual Insured** signing the **Application**, no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.  SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.  EXTENSION PERIOD

A.  If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Parts 1, 2, 3, and 5 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim**.

Upon expiration of the Automatic Extension, the **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, or 100% of this Policy's annual premium to an extension of

the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B. If the **Parent Organization** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium, the following will apply:

The **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, or 100% of this Policy's annual premium, to an extension of the coverage granted under Parts 1, 2, 3 and 5 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII., any change in premium or terms on renewal shall not constitute a refusal to renew.

IX. CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** or **Workplace Violence Act**, except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X. ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Parent Organization** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Parent Organization** shall be the agent of any **Insured** to effect changes in this Policy.

XII. OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** or **Workplace Violence Acts** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

XIII. TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of any state in which this Policy is issued are hereby amended to conform to such statutes.

XIV. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

XV. ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XVI. CHANGE IN OWNERSHIP OR CONTROL

A.   If after the inception of the **Policy Period**:

1.   The **Organization** merges into or consolidates with another entity such that the other entity is the surviving entity; or

2.   Another entity or person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Organization**; or

3.   Another entity or person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the **Organization's** directors or trustees;

(1., 2., and 3. above, hereinafter referred to as the "Merger"), then coverage under Parts 1, 2, 3, and 5 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** (or the Extension Period, if purchased) for **Wrongful Acts** committed prior to the effective date of the Merger and only if the following conditions are met:

1.   The **Insured** provides written notice of the Merger to the **Underwriter** within 45 days of the effective date of such Merger; and

2.   The **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary.

PI-NPD-2 (01/02)

If **Insured** fails to meet conditions 1. and 2. above, this Policy shall be deemed cancelled by the **Underwriter** as of the effective date of the Merger and the **Underwriter** shall return any unearned premium on a pro rata basis. The **Insured** shall have the right to purchase the Extension Period.

Coverage under Part 4 of this Policy shall cease with respect to any **Workplace Violence Act** occurring after the effective date of the Merger.

B.   If after the inception of the **Policy Period**:

    1.   The **Organization** acquires or assumes more than fifty percent (50%) of the assets, liabilities, or equity of, or merges with any for profit entity or creates a for profit subsidiary, no coverage shall be afforded under this Policy for **Claims** arising out of, based upon or attributable to such transaction unless all of the following conditions are met:

        a.   The **Underwriter** receives from the **Parent Organization** full details of such transaction; and

        b.   The **Underwriter**, at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for profit entity upon such terms, conditions and limitations as it may require.

XVII.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed or any **Workplace Violence Act** occurring anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim** or **Workplace Violence Act**. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, **Workplace Violence Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.   ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered **Loss**. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-NPD-2 (01/02)

IN WITNESS WHEREOF, the **Underwriter** has caused this Policy to be signed by its President and Secretary, but the same shall not be binding upon the **Underwriter** unless signed by an authorized representative of the **Underwriter**.

President & CEO

Secretary

PI-NPD-4 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL ORGANIZATION ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part(s) **1, 2, 3**        , Part 6, Common Policy Definitions, J. **Organization** is deleted and replaced as follows:

**J. Organization** means:

1. the **Parent Organization**,
2. any **Subsidiary**,
3. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**, and
4. Community of the Good Shepherd, A Division of Alternative Op
   Springfield Partners, LLC
   Community of the Good Shepherd Manor Housing Corp
   Community of the Good Shepherd Village Housing Corp
   Health Resources of Arkansas

Page  1 of  1

PI-NPD-8 (1-02)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT
CAREFULLY.**

## SHARED LIMITS ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

It is agreed the combined/shared Limit of Liability available for any **Claim** under Part(s) 1
and any **Claim** under Part(s) 2, 3        shall be $   5,000,000.

Notwithstanding the foregoing, the Limit of Liability available for any **Claim** under a coverage Part
shall also be subject to such Parts Limit of Liability as stated in Item 3 of the Declarations.

PI-NPD-25 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION (SUPERVISION CARVE-OUT)

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

Provided, however, that the foregoing shall not be applicable to any derivative action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

PI-NPD-26 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## RELATED PARTY EXCLUSION

This endorsement modifies and is subject to the Insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part(s) 1, 2, 3      , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** brought by or against, arising out of, directly or indirectly resulting from or in consequence of, the activities or operation of the following related party:

Lake Country Resource Centers

BMHI

Pathways Community Supports, LLC

JMark Business Solutions, Inc.

ALTERNATIVE OPPORTUNITIES, INC.

PI-NPD-27 (10/11)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SEXUAL ABUSE EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

**FLEXI PLUS FIVE**

With respect to coverage under Part 1 Not-for-Profit Directors and Officers Liability Insurance and Part 2 Employment Practices Act, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any act of sexual misconduct, sexual molestation or physical or mental abuse.

It is further agreed and understood that with respect to coverage under Part 2 Employment Practices Act, this exclusion shall not apply to sexual harassment, emotional distress and mental anguish that is alleged within a **Claim** for an **Employment Practice Act**.

All other terms, conditions and exclusions remain unchanged.

PI-NPD-41 (10/11)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ANTI-TRUST AND UNFAIR TRADE PRACTICE SUBLIMIT ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

**FLEXI PLUS FIVE**

I.  With respect to coverage under Part 1 Not-for-Profit Directors and Officers Liability Insurance, it is agreed the Limit of Liability for Antitrust and Unfair Trade Practice shall be $____150,000____ (hereinafter "sublimit").  This sublimit shall be included within the Limit of Liability as set forth in Item 3. (A) of the Declarations Page and in no way serves to increase the Aggregate as set forth in Item 3. (F) of the Declarations Page.

II.  It is further agreed and understood that solely with respect to any Antitrust and Unfair Trade Practice, Part 8 Common Policy Conditions, Section I. LIMITS OF LIABILITY, Item D. is deleted in its entirety and replaced with the following:

   D.  **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations.  Payment by the **Underwriter** of **Defense Costs** incurred on account of any Antitrust and Unfair Trade Practice shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable sublimit has been exhausted.

III.  For the purpose of this endorsement, the term Antitrust and Unfair Trade Practice shall mean any **Claim** made against any **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving charges of price fixing, restraint of trade, monopolization or unfair trade, or any actual or alleged violation of:

   A.  The Federal Trade Commission Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities;

   B.  Any rules or regulations promulgated under or in connection with the statutes described in A. above; or

   C.  Any similar provision of any state, federal or local statutory law or common law.

All other terms and conditions of this policy remain unchanged.

PI-NPD-50 (8/03)

## **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**FLEXI PLUS FIVE**

Under **Part 3**, Fiduciary Liability Insurance:

The following is added to Section II. DEFINITIONS:

C. **Fiduciary Liability Act** also means:

    3. a.    any actual or alleged breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) including amendments thereto; or, by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) including amendments thereto; or

        b.    any other actual or alleged violation of HIPAA by the **Insured** due solely to such **Insured's** service as a fiduciary of a **Benefit Plan**; or

        c.    any actual or alleged negligent violation of HIPAA by any **Insured** in the **Administration** of any **Benefit Plan**.

It is further agreed that Section III. EXCLUSIONS is amended as follows:

Paragraph B. is deleted in its entirety and replaced with:

B.    to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law, except to the extent that:

    1.    the benefits are payable by an **Individual Insured** as a personal obligation; and

    2.    recovery for the benefits is based upon a covered **Fiduciary Liability Act**,

however, this exclusion shall not apply to **Defense Costs**.

Page 1 of 1

PI-NPD-52 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

With regard to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-NPD-68 (09/05)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## WAIVER OF RECOURSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

It is agreed that **PART 8, Common Policy Conditions,** item VII. SUBROGATION will also include:

With respect to coverage under **PART 3,** Fiduciary Liability Insurance, and in consideration of a portion of the fiduciary premium paid by the individual fiduciaries, it is agreed the **Underwriter** expressly waives its right to recourse against the **Insured** under Section 410 (b) (1) of **ERISA**.

PI-NPD-82 MO (10/12)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PRO-PAK ELITE ENHANCEMENT
## MISSOURI

This endorsement modifies insurance provided under the following:

**FLEXI PLUS FIVE**

**I.   DIRECTORS & OFFICERS COVERAGE ENHANCEMENTS**

Part 1 Not-for-Profit Organization Directors & Officers Liability Insurance is amended as follows:

A.   Section III. EXCLUSIONS, Item B., Paragraphs 3 and 4 are deleted in their entirety.

B.   ·Section III. EXCLUSIONS, Item C. will not apply to **Claims** with respect to coverage provided under Section I. INSURING AGREEMENTS, Item A.

C.   ORDER OF PAYMENTS

It is further understood and agreed that if a **Loss** shall be payable under more than one of the INSURING AGREEMENTS in Part 1 Not-for-Profit Organization Directors & Officers Liability Insurance, then the **Underwriter** shall, to the maximum extent practicable and subject at all times to the **Underwriter's** Limits of Liability specified in the Declarations, pay such **Loss** as follows:

1.   First, the **Underwriter** shall pay that **Loss**, if any, which the **Underwriter** may be liable to pay on behalf of the **Individual Insureds** under Section I. INSURING AGREEMENTS, Item A.;

2.   Second, the **Underwriter** shall pay that **Loss**, if any, which the **Underwriter** may be liable to pay on behalf of the **Organization** for **Claims** made against **Individual Insureds** and indemnified by the **Organization** under Section I. INSURING AGREEMENTS, Item B.;

3.   Third, the **Underwriter** shall make such other payments which the **Underwriter** may be liable to pay on behalf of the **Organization** for **Claims** made against the **Organization** under Section I. INSURING AGREEMENTS, Item C.

**II.   EMPLOYMENT PRACTICES LIABILITY COVERAGE ENHANCEMENTS**

Part 2 Employment Practices Liability Insurance is amended as follows:

A.   Section II. DEFINITIONS, Item A. **Employment Practice Act** is deleted in its entirety and replaced by the following:

**Employment Practice Act** means any actual or alleged:

1.   Wrongful dismissal, discharge or termination of employment;

2.   Breach of a written or oral employment contract or implied employment contract;

3.   Employment related misrepresentation;

4.   Wrongful failure to promote;

5.   Violation of employment discrimination laws (including harassment);

6. Wrongful deprivation of a career opportunity;

7. Employment related wrongful discipline;

8. Negligent employee evaluation, training or supervision;

9. Employment related invasion of privacy;

10. Employment related defamation (including libel and slander);

11. Sexual or workplace harassment of any kind;

12. Constructive discharge of employment;

13. Employment related retaliatory treatment;

14. Employment related humiliation;

15. Wrongful demotion;

16. Negligent reassignment;

17. Negligent hiring or retention;

18. Failure to grant tenure;

19. Failure to provide or enforce consistent employment policies and procedures;

20. Failure to employ;

21. Violation of any federal, state or local civil rights laws; and

22. Acts described in 1. through 21. above arising from the use of the **Organization's** Internet, e-mail, blog, telecommunication or similar system, including communications on any **Social Media Network**;

And committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged discrimination, harassment or violation of such **Third Party's** civil rights in relation to such discrimination or harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

B. Section II. DEFINITIONS, Item B. **Third Party** is deleted in its entirety and replaced by the following:

**Third Party** means any natural person who is not an **Individual Insured**.

C. Section II. DEFINITIONS is amended to include the following:

**Social Media Network** shall mean a web-based service that allows an individual to:

PI-NPD-82 MO (10/12)

1. Construct a public or semi-public profile within a system; or

2. Articulate a list of other users with whom they share a connection; or

3. View and traverse their list of connections and those made by others within the network.

D. Section III. EXCLUSIONS, Item C. is amended by the addition of the following:

However, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is participating in the above labor actions.

## III. FIDUCIARY LIABILITY COVERAGE ENHANCEMENTS

Part 3 Fiduciary Liability Insurance is amended as follows:

This section only applies if a Limit of Liability is specified for Fiduciary Liability Insurance on the Declarations Page.

A. VOLUNTARY COMPLIANCE EXTENSION

Section I. INSURING AGREEMENTS, is amended by the addition of the following:

The **Underwriter** will pay on behalf of the **Insured**, in an amount not to exceed $100,000, any **Voluntary Compliance Fee** incurred with respect to a **Voluntary Compliance Notice**. Such amount shall be subject to the Retention stated in Item 4. (C) of the Declarations Page and shall be part of and not in addition to the Limit of Liability stated in Item 3. (C) of the Declarations Page. This Insuring Agreement shall not apply to any **Voluntary Compliance Fee** incurred with respect to any **Insured's** participation in any **Voluntary Compliance Program** initiated prior to the inception of this Policy.

B. Section II. DEFINITIONS, Item B. **Benefit Plan** is deleted in its entirety and is replaced by the following:

**Benefit Plan** means:

1. Any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the **Individual Insureds** of the **Organization**;

2. Any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the **Individual Insureds** of the **Organization**, provided that coverage was available with respect to such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. Any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Individual Insureds** of the **Organization**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion. The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the **Parent Organization**, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period**; and

4. Any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Individual Insureds** of the **Organization**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this Policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. Part 6 Common Policy Definitions, Item D. **Defense Cost** is amended by the addition of the following:

    d. **Voluntary Compliance Fee**.

D. Part 6 Common Policy Conditions, Item I. **Loss** is amended by the addition of the following:

**Loss** means any penalties or other awards imposed by the Pension Ombudsman of England or Occupational Pensions Regulatory Authority of England pursuant to the English Pension Scheme Act 1933, the English Pensions Act 1995, the UK Pensions Act 2004, as amended, and any rules and regulations promulgated thereunder, provided always that no part of the premium for this Policy attributable to this exception has been funded, paid or reimbursed from the funds or assets of any pension scheme insured under this Policy.

E. Part 6 Common Policy Definitions, is amended by the addition of the following:

**Voluntary Compliance Fee** means any costs of corrections, fees, penalties or sanctions imposed by law under a **Voluntary Compliance Program** that any **Insured** becomes legally obligated to pay as a result of a **Fiduciary Wrongful Act**, but shall not include any other costs, charges, expenses, fees, penalties, sanctions, assessments, damages, taxes or matters that may be deemed to be uninsurable under the law pursuant to which this Policy shall be construed.

**Voluntary Compliance Notice** means any written notice given to the **Underwriter** indicating an **Insured's** intent to participate in a **Voluntary Compliance Program** during the **Policy Period**.

**Voluntary Compliance Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or Department of Labor of the United States, including, but not limited to, the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance program and the Voluntary Fiduciary Correction program.

## IV. AMENDMENT OF DEFINITIONS

Part 6 Common Policy Definitions, is amended as follows:

A. Item B. **Claim** is deleted in its entirety and replaced by the following:

**Claim** means for the purposes of Parts 1, 2, 3 and 5:

1. Any of the following:

    a. Any written demand for monetary or non-monetary relief (including injunctive); or

    b. Any civil proceeding, including any appeals therefrom, commenced by the filing, notice or service of compliant, pleading, summons or similar document; or

    c.   Any criminal proceeding, including any appeals therefrom, commenced by the return of an indictment or the filing of notice of charges or similar document; or

    d.   Any formal administrative, judicial, regulatory or tribunal proceeding, including any proceeding before the Equal Employment Opportunity Commission or any similar governmental agency, commenced by the filing of notice of charges, formal investigative order, service of summons, subpoena or similar document; or

    e.   Any arbitration, mediation or similar alternative dispute resolution proceeding commenced by receipt of a demand for such proceeding,

Against an **Insured** for a **Wrongful Act**; or

    2.   Any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A **Claim** shall be considered made when an **Insured** first receives notice of the **Claim**.

B.   Solely with respect to Parts 1, 2, 3 and 5, Item C. **Damage** is deleted in its entirety and replaced by the following:

**Damage** means a monetary judgment, award or settlement, including punitive and exemplary damages or multiple portion thereof, (including pre and post judgment interest thereon) to the extent such punitive and exemplary damages or multiple portion thereof, are insurable under applicable law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage, and which is most favorable to the insurability of such damage.

C.   Item D. **Defense Cost** will also mean any pre-judgment interest and post-judgment interest on the portion of any judgment for which the **Underwriter** is liable under this Policy, until the **Underwriter** has tendered or deposited in court or otherwise, such judgment amount for which the **Underwriter** is liable.

D.   With respect to **Claims** brought under Part 2 Employment Practices Liability Insurance, of this policy only, Item F. **Individual Insured** will also mean any independent contractor working on behalf of the **Organization**, but only if the **Organization** has agreed in writing to indemnify the independent contractor prior to the occurrence of the **Employment Practices Act** that is the basis of the **Claim**.

E.   With respect to **Claims** brought under Part 2 Employment Practices Liability Insurance, Item F. **Individual Insured** will also mean any applicant for employment with the **Organization**.

F.   Item F. **Individual Insured** will also mean the lawful domestic partner of a director, officer, governor, trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such director, officer, governor, trustee, or equivalent executive for which such domestic partner may be liable as the domestic partner of such director, officer, governor, trustee, or equivalent executive.

G.   Item I. **Loss** will also include fines and penalties resulting from a **Claim** provided that they are brought:

    1.   Seeking coverage for an **Excess Benefit Transaction Excise Tax**; or

PI-NPD-82 MO (10/12)

2. Alleging violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. 1396dd, et seq., and any other similar state or local statute.

The foregoing is subject to the following provisions:

a. The Limit of Liability specified in the Declarations is replaced by $100,000 per **Claim** and $100,000 for all **Claims** in the **Policy Period**. This Limit of Liability will apply to the total of all **Loss** and **Defense Cost** combined, even if this Policy is endorsed to provide **Defense Cost** in addition to the Limit of Liability.

This inclusion of **Defense Cost** within the Limit of Liability, for all coverage provided by Item I. **Loss** above, will supersede any provision to the contrary.

The **Underwriter** will not be liable for **Damage** arising out of an **Excess Benefit Transaction Excise Tax**, as provided herein, for amounts exceeding $10,000 that an **Individual Insured** is obligated to pay as a result of a **Claim**.

b. Coverage will exist if and only to the extent that indemnification is provided by the **Organization** to any **Insured** for any **Excess Benefit Transaction Excise Tax**.

c. The **Underwriter** will not be liable to make payment for any **Loss** or **Defense Cost** in connection with any **Claim** for any excise tax imposed by the Internal Revenue Service on any Disqualified Person for any **Excess Benefit Transaction**.

d. **Excess Benefit Transaction** means an "excess benefit transaction" as that term is defined in the Taxpayer Bill of Rights 2, P.L. 104-168.

e. **Excess Benefit Transaction Excise Tax** means any excise tax imposed by the Internal Revenue Service on an **Individual Insured** as a result of the **Individual Insured's** participation in an **Excess Benefit Transaction**.

H. Item J. **Organization** will also mean:

4. Any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

I. Item M. **Subsidiary** will also mean any not-for-profit entity for which, on or before the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as an Affiliate in the **Application**.

J. Item L. **Policy Period** is amended to include that if the calendar date upon which this Policy is scheduled to expire is a "Weekend" or "National Holiday" then this Policy's expiration date is automatically extended to the next day immediately following the "Weekend" or "National Holiday".

For the purpose of clause J. above, the following applies:

1. "Weekend" shall mean the calendar days of Saturday and Sunday.

2. "National Holiday" shall means the calendar days designated as such by the United States Federal Government per U.S. Federal law (5 U.S.C. 6103).

## V.  AMENDMENT OF EXCLUSIONS

Part 7 Common Policy Exclusions, is amended as follows:

PI-NPD-82 MO (10/12)

A. Item C. will not apply to **Claims** with respect to coverage provided under Part 1 Not-for-Profit Organization Directors & Officers Liability Insurance, Section I. INSURING AGREEMENTS, Item A.

B. Items D., G., and H. are deleted in their entirety.

C. Item F. Paragraph 2. is deleted in its entirety and replaced by the following:

   2.  Any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance, with a similar type of coverage, prior to inception of this Policy; or

D. Item F., Paragraph 3. is deleted in its entirety.

E. Item J. will not apply to any **Claim** brought as a derivative action, or similar action, on behalf of the **Organization**, provided the **Claim** is brought without the assistance of any current or former director, officer, governor, trustee or equivalent executive of the **Organization** who has not served in such capacity within four (4) years immediately proceeding the date the **Claim** is first made.

## VI.  AMENDMENT OF CONDITIONS

Part 8 Common Policy Conditions, is amended as follows:

A.  AGGREGATE RETENTION

Section II. RETENTION CLAUSE, is deleted in its entirety and replaced with the following:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts**.

During the **Policy Period** an "Aggregate Retention" will apply for each coverage Part.  The "Aggregate Retention" will be triple (3 times) the amount of the Retention(s) stated in Item 4. of the Declarations Page.

B.  MODIFICATION OF CONSENT TO SETTLE

Section III. DEFENSE AND SETTLEMENT, Item G. is deleted in its entirety and replaced by the following:

If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Cost** incurred, up to the date of such refusal, plus 80% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 20% of such **Loss** in excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4 of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's

applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount stated in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

C. AMENDMENT OF SEVERABILITY

Section VI. REPRESENTATIONS AND SEVERABILITY is deleted in its entirety and replaced by the following:

1. In granting coverage to any **Insured** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written **Application(s)** for this Policy.  Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

2. Any written **Application(s)** shall be construed as a separate **Application(s)** for coverage by each **Insured**.  With respect to the declarations and statements in such **Application(s)**:

   a. No fact pertaining to, or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

   b. Only facts pertaining to, and knowledge possessed by the Chief Financial Officer, President, Executive Director or Chairperson of any part of the **Organization** or any other individual signing such **Application(s)** shall be imputed to the **Organization** for the purpose of determining if coverage is available.

D. AUTOMATIC UNLIMITED REPORTING PERIOD FOR FORMER DIRECTORS & OFFICERS

Section VIII. EXTENSION PERIOD is amended by the addition of the following:

If the **Parent Organization** cancels or does not renew this Policy for a reason other than being sold, acquired or bankrupt, any former director, officer, governor, trustee, or equivalent executive of the **Parent Organization** who was not serving in the capacity as a director, officer, governor, trustee, or equivalent executive of the **Parent Organization** at the time of the cancellation or non-renewal shall be provided an "Unlimited Extension Period" to report any **Claim** which may be first made against such former director, officer, governor, trustee, or equivalent executive after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Act** committed before the date of such cancellation or non-renewal.

However, this "Unlimited Extension Period" shall only be afforded if no other Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or Extension Period other than B. above, is in effect at the time the **Claim** is made.

E. BROADENED OTHER INSURANCE CLAUSE

Section XII. OTHER INSURANCE is deleted in its entirety and replaced with the following:

PI-NPD-82 MO (10/12)

Insurance provided under this Policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is specifically written as excess. This Policy shall be excess over any other policy under which another insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay a **Claim** as a result of **Loss**.

F.  FULL ALLOCATION

Solely with respect to **Claims** for which the **Insured** has tendered control of the defense to the **Underwriter**, per Part 8 Common Policy Conditions, Section III. DEFENSE AND SETTLEMENT, Item A.; Section XIX. ALLOCATION is deleted in its entirety and replaced by the following:

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes, both covered and uncovered amounts, or because a **Claim** is made against both covered and uncovered parties, then coverage shall apply as follows:

1.  **Defense Costs**: one hundred percent (100%) of reasonable and necessary **Defense Costs** incurred by such **Insured** and authorized by the **Underwriter** from such **Claim** will be considered covered **Loss**; and

2.  **Loss** other than **Defense Costs**: all remaining **Loss** incurred by such **Insured** will be determined based upon the relative legal exposures of the parties to such matters.

All other terms of the policy remain unchanged.

PI-Notice-MO (4-01)

# IMPORTANT NOTICE

To obtain information or make a complaint:

1.  You may call Philadelphia Indemnity Insurance Company's toll-free telephone number for information or to make a complaint at

    **1-877-438-7459**

2   You may write to Philadelphia Indemnity Insurance Company at our principal place of business:

    Philadelphia Indemnity Insurance Company
    One Bala Plaza, Suite 100
    Bala Cynwyd, PA 19004
    (610) 617-7900
    FAX # (610) 617-7940

3.  **ATTACH THIS NOTICE TO YOUR POLICY:**

    This notice is for information only and does not become a part or condition of the attached document.

Page 1 of 1

PI-NPD-MO-1 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDATORY ENDORSEMENT
## MISSOURI

This endorsement modifies insurance provided under the following:

FLEXIPLUS FIVE

Part 8 Common Policy Conditions, Item V. is replaced by the following:

V.  CANCELLATION AND NON-RENEWAL

CANCELLATION

a. The first Named Insured may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by sending by certified mail, or delivering, to you a written notice, stating the actual reason(s) for cancellation, at your last mailing address known to us.

Cancellation will be effective:

(1) 10 days after you receive notice of cancellation if we cancel for nonpayment of premium;

(2) 30 days after you receive notice of cancellation if we cancel for fraud or material misrepresentation by you affecting this policy or a claim filed under this policy; or

(3) 60 days after you receive notice of cancellation if we cancel for any other reason,

unless we specify a later date in our notice as the effective date of cancellation.

c. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata.
If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

NON-RENEWAL

If we decide not to renew this policy, we will send written notice of Non-renewal to you, stating the actual reason(s) for non-renewal, at least 60 days before the end of the policy period. We will send our non-renewal notice by certified mail, or deliver it, to you at your last mailing address known to us.

PI-SLD-001 (01/08)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

FROM: Anita Ford<AFord@connellinsurance.com>
TO: claimsreport@phly.com
SENT: Wednesday, February 8, 2017 12:31:45 PM Eastern Standard Time
SUBJECT: NEW CLAIM - Preferred Family Healthcare | Date of Loss: 2/3/2017
ATTACHMENTS: image001.jpg; ACORD - PFH 2.3.17.pdf; Emails - PFH.PDF;
==========================================================================

Please see new claim attached.

Also, please respond to this email providing the claim number and adjuster's name & contact
information.

Thank you,

## Anita Ford

✉ *Connell Insurance, Inc.*
*Claims Department*
*Direct Phone: 417-973-0829*
*Direct Fax: 417-973-0729*
aford@connellinsurance.com

*Please keep in mind, you cannot bind, modify, or terminate coverage per an email request without a confirmation back from your
agent.*

**ACORD®**   **GENERAL LIABILITY NOTICE OF OCCURRENCE / CLAIM**

| DATE (MM/DD/YYYY) |
|---|
| 2/8/2017 |

| AGENCY | | | INSURED LOCATION CODE | DATE OF LOSS AND TIME | AM / PM |
|---|---|---|---|---|---|
| Connell Insurance, Inc. | | | | 2/3/2017 | |
| P.O. Box 1840 | | | CARRIER | | NAIC CODE |
| | | | Philadelphia Insurance Company | | |
| Branson       MO  65615 | | | POLICY NUMBER | | |
| CONTACT NAME: Anita Ford | | | PHSD1140827 | | |
| PHONE (A/C, No, Ext): (417) 973-0829 | | | | | |
| FAX (A/C, No): (417) 973-0729 | | | | | |
| E-MAIL ADDRESS: aford@connellinsurance.com | | | | | |
| CODE: | SUBCODE: | | | | |
| AGENCY CUSTOMER ID: 00015056 | | | | | |

**INSURED**

| NAME OF INSURED (First, Middle, Last) | | | INSURED'S MAILING ADDRESS |
|---|---|---|---|
| Preferred Family Healthcare, Inc. | | | Attn: Jamie Campbell |
| DATE OF BIRTH | FEIN (if applicable) | | PO Box 767 |
| | 431608916 | | Kirksville       MO  63501 |
| PRIMARY PHONE # ☐ HOME ☒ BUS ☐ CELL   SECONDARY PHONE # ☒ HOME ☐ BUS ☐ CELL | | | PRIMARY E-MAIL ADDRESS: jcampbell@pfh.org |
| (660) 626-0630 xJamie | | | SECONDARY E-MAIL ADDRESS: |

**CONTACT**   ☐ CONTACT INSURED

| NAME OF CONTACT (First, Middle, Last) | CONTACT'S MAILING ADDRESS |
|---|---|
| Ralph Downs | Preferred Family Healthcare, Inc. |
| PRIMARY PHONE # ☒ HOME ☐ BUS ☐ CELL   SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL | PO Box 767 |
| (479) 871-5775 | Kirksville       MO  63501 |
| WHEN TO CONTACT | PRIMARY E-MAIL ADDRESS: rdowns@pfh.org |
| | SECONDARY E-MAIL ADDRESS: |

**OCCURRENCE**

| LOCATION OF OCCURRENCE | POLICE OR FIRE DEPARTMENT CONTACTED |
|---|---|
| STREET: | |
| CITY, STATE, ZIP: | REPORT NUMBER |
| COUNTRY: | |

DESCRIBE LOCATION OF OCCURRENCE IF NOT AT SPECIFIC STREET ADDRESS:

DESCRIPTION OF OCCURRENCE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
DATE OF LOSS IS DATE NOTICE WAS RECEIVED BY INSURED'S ATTORNEY FROM US ATTORNEY'S OFFICE FOR WESTERN
DISTRICT OF MISSOURI - SUBPOENA IS EXPECTED TO FOLLOW.
***SEE ATTACHED NOTICE***

**TYPE OF LIABILITY**

| PREMISES: INSURED IS | OWNER | TENANT | | TYPE OF PREMISES | |
|---|---|---|---|---|---|
| OWNER'S NAME & ADDRESS (if not insured) | | | | | |
| | | | | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL   SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL | |
| | | | | PRIMARY E-MAIL ADDRESS: | |
| | | | | SECONDARY E-MAIL ADDRESS: | |
| PRODUCTS: INSURED IS | MANUFACTURER | VENDOR | | TYPE OF PRODUCT | |
| MANUFACTURER'S NAME & ADDRESS (if not insured) | | | | | |
| | | | | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL   SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL | |
| | | | | PRIMARY E-MAIL ADDRESS: | |
| | | | | SECONDARY E-MAIL ADDRESS: | |
| WHERE CAN PRODUCT BE SEEN? | | | | | |

ACORD 3 (2013/01)                    Page 1 of 4          © 1986-2013 ACORD CORPORATION. All rights reserved.
INS003 (201301)                    The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** 00015056

## INJURED / PROPERTY DAMAGED

| NAME & ADDRESS (Injured/Owner) | | EMPLOYER'S NAME & ADDRESS | |
|---|---|---|---|

| PRIMARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | PRIMARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL |
|---|---|---|---|---|---|---|---|

| PRIMARY E-MAIL ADDRESS: | PRIMARY E-MAIL ADDRESS: |
|---|---|
| SECONDARY E-MAIL ADDRESS: | SECONDARY E-MAIL ADDRESS: |

| AGE | SEX | OCCUPATION | DESCRIBE INJURY |
|---|---|---|---|

| WHERE TAKEN | WHAT WAS INJURED DOING? |
|---|---|

| DESCRIBE PROPERTY (Type, model, etc.) | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? |
|---|---|---|

## WITNESSES

| NAME AND ADDRESS | PRIMARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL |
|---|---|---|---|---|
| | PRIMARY E-MAIL ADDRESS: | | | |
| | SECONDARY E-MAIL ADDRESS: | | | |
| NAME AND ADDRESS | PRIMARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL |
| | PRIMARY E-MAIL ADDRESS: | | | |
| | SECONDARY E-MAIL ADDRESS: | | | |
| NAME AND ADDRESS | PRIMARY PHONE # | ☐ HOME ☐ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL |
| | PRIMARY E-MAIL ADDRESS: | | | |
| | SECONDARY E-MAIL ADDRESS: | | | |

## REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| REPORTED BY | REPORTED TO |
|---|---|
| RALPH DONNS | CONNELL INSURANCE |

ACORD 3 (2013/01)
INS003 (201301)

Page 2 of 4

AGENCY CUSTOMER ID: 00015056

## APPLICABLE IN ALABAMA

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

## APPLICABLE IN ALASKA

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

## APPLICABLE IN ARIZONA

For your protection, Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

## APPLICABLE IN ARKANSAS, DELAWARE, KENTUCKY, LOUISIANA, MAINE, MICHIGAN, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH DAKOTA, PENNSYLVANIA, RHODE ISLAND, SOUTH DAKOTA, TENNESSEE, TEXAS, VIRGINIA, AND WEST VIRGINIA

Any person who knowingly and with intent to defraud any insurance company or another person, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and [NY: substantial] civil penalties. In LA, ME, TN, and VA, insurance benefits may also be denied.

## APPLICABLE IN CALIFORNIA

For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

## APPLICABLE IN COLORADO

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an Insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any Insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

## APPLICABLE IN THE DISTRICT OF COLUMBIA

Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

## APPLICABLE IN FLORIDA

Pursuant to S. 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in S. 775.082, S. 775.083, or S. 775.084, Florida Statutes.

## APPLICABLE IN HAWAII

For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

## APPLICABLE IN IDAHO

Any person who knowingly and with the intent to injure, defraud, or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

## APPLICABLE IN INDIANA

A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

AGENCY CUSTOMER ID: 00015056

### APPLICABLE IN KANSAS

Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

### APPLICABLE IN MARYLAND

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### APPLICABLE IN MINNESOTA

A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### APPLICABLE IN NEVADA

Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains any false, incomplete or misleading information concerning a material fact is guilty of a felony.

### APPLICABLE IN NEW HAMPSHIRE

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### APPLICABLE IN OHIO

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### APPLICABLE IN OKLAHOMA

WARNING: Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### APPLICABLE IN WASHINGTON

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.